HOLT MFG. CO. v. BEST MFG. CO.

(Circuit Court of Appeals, Ninth Circuit. August 2, 1909.)

No. 1,608.

1. PATENTS (§ 34*)—INFRINGEMENT—ACTION AT LAW—EVIDENCE.

Where the question of invention is left to the jury in an action for infringement of a patent, no evidence tending to show the true state of the art at the date of the claimed invention should be excluded.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 38; Dec. Dig. § 34.*]

2. PATENTS (§ 276*)—SCOPE OF INVENTION—COMBINED STEAM HARVESTER AND THRASHER.

The Best patent, No. 410,306, for a combined steam harvester and thrasher, is for a claimed combination of elements all of which were old; the chief feature of novelty claimed for the combination being the operation of the cutting and thrashing machinery by means of a supplementary engine mounted upon the thrasher frame, to which steam is supplied from the boiler of the traction engine by means of a flexible pipe. Such supplementary engines had previously been used for the same purpose on similar machines driven by horse power. Held, that such patent was not a pioneer patent, but an improvement patent only, and that it was error in an action for its infringement to refuse to so instruct the jury, and to submit the question to them for decision.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 276.*]

In Error to the Circuit Court of the United States for the Northern District of California.

I. M. Kalloch and Francis St. J. Fox, for plaintiff in error.

J. J. Scrivner, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. The defendant in error was plaintiff in the court below, where it brought this action for the alleged infringement of letters patent granted on the 3d day of September, 1889, to one Daniel Best, for an improvement in combined harvesters and thrashers. The defendant to the action was the Holt Manufacturing Company, which is the plaintiff in error here. The trial resulted in a verdict and judgment in favor of the plaintiff for $35,000.

Long before the issuance of the plaintiff's patent, mowers and reapers had been superseded on many of the great western grain fields by combined machines, operated by steam as well as by horse power, which cut, thrashed, cleaned, and sacked grain. The plaintiff's patent, as has been said, was for an improvement in combined harvesters and thrashers. No new element entered into the make-up of its machine; but the contention on its behalf was and is that it was a patentable combination of old elements, whereas, the conten-

tion on behalf of the defendant was and is that it was a mere aggregation of such elements.

Of course, if it was a mere aggregation, that is to say, if what Best did was merely to bring together a lot of old elements, which in their new places did no more than their old work, there was no invention, and the action must necessarily fail; but if the old elements are so assembled as to coact in a unitary organization, and thereby produced a new and useful result, and such combination be more than a mere mechanic skilled in the art could have suggested, then patentability may be properly affirmed of it. That was really the only issue presented by the pleadings; the answer of the defendant merely denying, "generally and specifically, each and every allegation contained in the plaintiff's complaint."

Best testified that the difficulty with the old horse-power machines was that the power came from the movement of the horses operating upon the main wheels of the machine, and in his testimony sought to show, among other things, that he had overcome that difficulty by substituting therefor steam power. We extract from his testimony:

"I was manufacturing a horse combined harvester for about three years before I conceived the idea of making them steam combined.

"Q. Tell the jury what a combined harvester is, going back to that old harvester that was in operation that you made and was in general use? A. The horse-power, you mean?

"Q. Yes, tell them what a horse-power machine was at that time, not the present machine that is made nowadays. A. The horse-power machine consists first of a header to cut the grain, then a thrashing machine to thrash it, and then a grain separator to separate the different kinds of grain, to put them in separate sacks. This machine was driven, got its power from one main, big wheel.

"Q. What do you call that wheel? A. The main driving wheel. It was located on the left-hand side of the machine. It is the same wheel that carries the machine, and the wheel that carries the right-hand side of the machine, the opposite side, that wheel also drove the header part, so the whole mechanism is driven from the machine. The difficulty with that machine was, after experimenting with it two or three years, we found we could not take up down-grain. The difficulty with these horse-power machines in taking up down and heavy grain is that we could not get power enough from the wheels, strong enough, to drive those sickles and separators when she was cutting this heavy down-grain and taking up large quantities of straw. Horses had to travel at just the same speed all the time, and when they would come to this thick, heavy down-grain, if you would undertake to take it up it would choke down, and the result was the horses would run over it, and you would leave it on the ground. This, I discovered, was an enormous loss to the farmers, and as high as $6 or $8 or $10 an acre was left on the ground. I went to work immediately to see if I could not contrive some plan whereby we could take up all of this straw and thrash it and get the grain clear off the ground where those big crops were. I figured out that it would require from 80 to 100 horse power to do it. To start first, I built a traction combined harvester of large size, and then I applied an engine on my harvester frame, about 30 horse power. I found by this machine that, when I went in this heavy grain, I could travel at any speed I wanted, travel from a quarter or half a mile to a three mile speed, just according to the amount of straw that was on the ground, and that I could stop still. Whenever this heavy straw pushed ahead of my machine, or where it all rotted off on the ground, where it drops down and gets damp, it lays perfectly loose on the ground, and no machine will go through it and take it up because it will shove right ahead. On this machine, when it shoved ahead, it would throw up 4 or 5 feet high, and I could back up the machine in a few seconds and pick that up and take it aboard and bring it on my header with the reel and stand still there and thrash it out. On that

same ground, if a horse-power machine was working, or a header, or a sub-binder, or even a mower, you could not save at best more than two-thirds of it, while in the process we take it right down within a couple of inches of the ground and get it all."

The record shows that, about two years before what the plaintiff claims as the Best invention, one Berry had procured the issuance to him of a patent for a "combined steam traction header and thrasher," which invention the patentee declared relates "to that class of agricultural machines known as 'combined harvesters and thrashers,' and particularly to that class in which the power of the engine is directed not only to the operation of the several parts of the machine, but also to the progression of the machine," the construction and combination of the devices of which the patentee specifically described and claimed in a series of claims, the eleventh of which is as follows:

"11. In a combined steam traction harvester and thrasher, the frame, A, and an engine carried thereby, whereby its progression is effected, in combination with the thrasher, I, connected with the frame, A, a supplementary engine, M and power transmitting devices from said last-named engine to the cylinder of the thrasher, whereby it is driven at a uniform rate independent of the progression of the machine, substantially as described."

To further show the state of the art at and prior to the time of Best's claimed invention, the defendant undertook to show by the witness Kincaid, who testified that as early as 1883 he was called upon to design a steam harvester for one Pritchard, to be hauled by horses, though operated by means of a boiler and engine attached to the separator, that he saw that completed machine either in 1885 or 1886, and, being asked to describe it, the court, on the objection of the plaintiff that it was pulled by horses, declined to permit the witness to do so, although he testified that its thrashing and cutting machinery was operated by steam by means of a boiler located on the frame of the thrashing machine, and, on motion of the plaintiff, struck out the testimony of the witness. We think those rulings erroneous. It is not always easy, as the court below told the jury, to determine the true line of distinction between invention and that which one skilled in the art many readily suggest; but where, as in the present case, the determination of that question was left with the jury, we think it clear that nothing tending to show the true state of the art at the date of the claimed invention should have been excluded from their consideration. See 3 Robinson on Patents, 1020; Aron v. Manhattan Ry. Co., 132 U. S. 84, 10 Sup. Ct. 24, 33 L. Ed. 272; Penn. Ry. Co. v. Truck Co., 110 U. S. 490, 4 Sup. Ct. 220, 28 L. Ed. 222; Benbow-Brammer Co. v. Richmond Works (C. C.) 159 Fed. 161.

On the trial the plaintiff's witness Smyth, being asked on his direct examination wherein, in his opinion, Best's invention lay, said:

"I should say that it lies in bridging the gap between the traction engine and the harvester and header mechanism by crossing that gap with a device adapted to convey the energy or power by steam, rather than mechanical means to an engine located upon the thrasher frame so that the power of that engine may be applied to its greatest perfection to the header and thrasher mechanisms; in other words, in the substitution—I am going to use a couple

of unusual terms, but I think they will apply here—the substitution of a molecular transference of energy rather than a molar, that is, through a fluid medium, rather than through a mechanical medium."

And, in the same connection:

"In my opinion it involved the highest type of invention, that inspiration of idea, that happy thought of changing the method of transferring the power back from the traction engine to the other devices, was, in my opinion, one of the happiest thoughts that could be imagined."

When asked on cross-examination, in regard to his foregoing statements, the following question:

"Q. You think that the discovery that a flexible pipe would carry steam from the boiler in the position in which I have located it to the supplemental engine in the harvester frame is an indication of inventive talent and the exercise of inventive faculty, do you?"

—the witness Smyth answered:

"Under the circumstances, I emphatically say that it is an example of the highest type of inventive faculty."

Subsequently the defendant offered in evidence a patent issued to one Glover on the 8th day of December, 1888, for a traction engine, one feature of which was the conveying of steam through a flexible pipe from a boiler and engine carried on an engine truck, to a steam chamber arranged below a water tank carried on a separate frame. We extract from the testimony of the witness Smyth:

"Q. Did you hear Mr. Best testify that the novelty of his invention consisted in mounting a supplemental engine on the harvester frame with a flexible steam connection? A. I don't remember it, but I assume he did say so.

"Q. If he did say so, do you think he told the truth? A. Oh, certainly.

"The Court: Q. That is, that the crux of his invention was the mounting of the supplemental engine upon the harvester frame, and connecting it with a plastic or flexible connection? A. Yes, sir.

"Mr. Kalloch: Q. If he did say so, was that correct? A. Yes, sir."

Certainly, if it be true that the novelty of the Best invention consisted in the mounting of his supplemental engine upon the harvester frame and connecting it with the flexible pipe, the defendant was entitled to show, if it could, that that idea, as well as mechanism for such pipes, was old. There was therefore error in excluding, as the court below did, the Glover patent.

On the trial the defendant requested the court to instruct the jury, among other things, as follows:

"The Best patent sued upon in this case is in no sense a pioneer patent. In view of the prior art, as disclosed by the Berry patent, the construction which the court is required to give the Best patent places it in a class wherein the application of the doctrine of mechanical equivalents is very narrow, and the patentee is limited to the precise devices and combinations shown and claimed in his patent. If therefore you find from the evidence that the defendant has not made or used or sold a combined harvester and thrashing machine having a supplemental or auxiliary engine mounted upon a platform at the side of the thrashing machine, your verdict should be for the defendant."

The court refused to so instruct, but, on the contrary, by its instructions, left it to the jury to determine whether or not the Best patent was a pioneer one, to all of which the defendant excepted.

Allusion has already been made to the fact that each and every element entering into the Best patent was old, and the record shows

that the novelty claimed for it consisted chiefly in the location of the supplemental engine on the frame of the harvester, and the transferring of the power from that engine to the header and thrasher mechanisms by means of the flexible pipe; in other words, what Best did was, not to invent a combined steam harvester, but to make improvements in such harvesters, and his patent shows upon its face that he himself so characterized his invention. Leaving out of consideration the Pritchard machine and the Glover patent, the record shows that the preceding patent issued to Berry was for a combined steam harvester and thrasher, in which the power of the engine was directed not only to the operation of the several parts of the machine, but also to its progression. Among other things, it consisted: (1) Of a traction-engine frame mounted on wheels, whose sole function was the supporting and progression of the machine, effected by means of a boiler and engine; the driving power being transmitted through gears to the traction wheels. (2) Of a header frame connected by hinges with the side of the traction-engine frame. (3) A draper-platform carrying the draper, elevator, sickle, reel, and such other parts as are necessary thereto; the various parts of the header being operated by power transmitted from the engine located on the traction-engine frame. (4) Of a thrasher located on the left-hand side of the traction-engine frame, and its inner side attached to that frame by hinges, whereby it accompanies the traction engine, but still has its independent motion, enabling it to conform itself to the ground over which it travels. (5) A self-feeder of the thrasher, with which the elevator spout of the header communicates. (6) The cylinder of the thrasher. (7) An endless chain for driving the endless apron-platform and straw-carrier of the thrasher; such parts being operated from the engine located on the traction-engine platform by means of a shaft and connections, which engine also operated the elevator and the riddle, the cylinder, feeder, fan, and the pickers of the thrasher, however, being driven by means of an independent engine also located upon the traction-engine frame, and which supplemental engine is operated by steam taken from the boiler of the main engine. (8) Of an elevator by which the thrashed grain is taken up to the hopper, from which it is discharged to the sacker. (9) Of certain water tanks with suitable connecting pipes for the supply of water to the boiler. And (10) of fly wheels on the driving shaft of the main engine.

The operation of his machine was thus described by Berry:

"The progression of the entire machine is in effect wholly from the main engine by means of power transmitted to the traction wheels, a, which, as I have heretofore mentioned, serve no other purpose than that of supporting the machine and of causing its progression. They transmit no power to operate the parts of the machine. In the progression of the machine the hinged header frame on the one side, and the hinged thrasher on the other, have their own independent motion, and do not therefore cramp, whatever may be the character of the ground over which they pass. The draper-platform, with all its parts, is adjusted easily and conveniently, being kept level in all positions. The course of the grain is the usual one and needs no detailed description. The straw is discharged at the rear end free of dust and chaff, and is carried by the chute, O, down to the platform to where the engineer stands, and the surplasage is stored in the receptacle, Q. The whole machine is readily started from the seat p [10]."

Berry then proceeded to set forth his claims, the eleventh of which has been hereinbefore set out.

We think it very plain, from what has been said, that Best cannot be properly regarded as a pioneer inventor, who is one who stands at the head of the art, or who has at least made such a distinct step in its progress as to distinguish it from a mere improvement or perfection of what had gone before, and that the court below should have so instructed the jury, and not have left it to them to determine that question.

For the reasons stated, the judgment must be, and hereby is, reversed, and the cause remanded for a new trial.